DECISION
Before the Court are two timely appeals from two separate decisions of the Rhode Island Labor Relations Board (hereinafter referred to as the Board). Jurisdiction in the Superior Court is pursuant to G.L. 1956 (1993 Reenactment) § 42-35-15.
FACTS AND PROCEDURAL HISTORY
A review of the records indicates that the Town of Coventry (hereinafter referred to as the Town) appeals the Board's decisions and orders entered September 9, 1992 (ULP-4443) (hereinafter referred to as the 1992 Order), based on a hearing held April 6, 1992 (hereinafter referred to as Tr. 1), and January 5, 1996 (ULP-4719) (hereinafter referred to as the 1996 Order), based on a hearing January 10, 1994 (hereinafter referred to as Tr. 2). The 1992 Order was pursuant to a charge filed January 16, 1991, by Local 2198 of the International Association of Fire Fighters (AAIFF) of the AFL-CIO (hereinafter referred to as the Union), and the 1996 Order followed a charge filed June 20, 1993, by Local 3346 of the Union. (Although disputed by the Town, there is testimony in the record suggesting that the discrepancy in the numbering of the local union merely represented a "renumbering" of the local by the "international." (Tr. 2 at 16-18)). Certified records of both hearings are available, including transcripts and exhibits.
BACKGROUND
At the time of the 1992 Order, the Town employed four (4) fire alarm dispatchers who took calls and routed them to the various fire districts that provide fire-fighting services to the Town. (Tr. 1 at 16-17). Seven (7) fire districts, legal entities separate and distinct from the Town, provide these services. (Tr. 1 at 11). In 1973, Local 2198 was certified by the Board as the dispatchers' bargaining agent, and a contract with the Town was apparently entered into, but was not renewed after its expiration. (Tr. 1 at 43, Union Exh. 2). Although it is unclear in 'the record when the original contract expired, (Tr. 1 at 47), it is undisputed that there was no contract in effect when negotiations began in the Fall of 1990. (Tr. 1 at 42-43). Prior to this, on October 2, 1988, a fire dispatcher had slept through an emergency call, after which various fire chiefs and the Town Council questioned the effectiveness of the dispatching service. (Tr. 1 at 16-19 and Town Exh. 1). The privatization of the dispatcher system was considered as an alternative at that time (Tr. 1 at 20-22 and Town Exh. 4), but was not implemented until July 1, 1993. (Tr. 2 at 23 and Town Exh. 1).
FALL 1990 NEGOTIATIONS
In the Fall of 1990, the Union sent the Town a letter in order to initiate the negotiating process for a contract for the year starting July 1, 1990, through June 30, 1991. (Tr. 1 at 3, statement of Union attorney) On October 5, 1990, the Town and the Union executed ground rules to be followed in their negotiations. (Tr. 1 at 35-36 and Union Exh. 3). The negotiating sessions were to begin October 19, 1990, and to conclude November 19, 1990, unless extended by mutual agreement, and all initial proposals were to be presented on or before October 19, 1990. (Tr. 1 at 36, Union Exh. 3). At the October 19, 1990 negotiating session, the Town introduced a draft of its proposal, which included a provision allowing it to establish contracts or subcontracts for Town operations, which the Union rejected. (Tr. 1 at 37 and Union Exh. 4, p. 4). At that meeting, the town verbally informed the Union that it was "thinking about subcontracting" the fire dispatch service. (Tr. 1 at 7). After the meeting, the Town solicitor apparently asked for proof that the Union was "legitimate, " and on November 14, 1990, the Union attorney responded with what he "thought was appropriate documentation, " but there were no further negotiating sessions. (Tr. 1 at 5, statement of Union attorney, and Union Exh. 2). On December 24, 1990, the Town advertised a "Request for Proposal Fire Alarm Operation" in the Kent County Daily Times seeking bids "to operate the currently Town-provided fire alarm dispatch service." (Tr. 1 at 8 and Town Exh. 5). On January 7, 1991, the Union filed an unfair labor practice charge (hereinafter referred to as the 1991 charge) against the Town, alleging in pertinent part that the Town violated G.L. §§ 28-7-12 and 28-7-13 of the State Labor Laws when it "threatened to subcontract out the fire alarm operation, which would affect the members of Local 2198," while it was in contract negotiations with that Local, and by advertising for bids to provide this service. (1991 Charge). On March 19, 1991, an informal conference was held between representatives of the Town and the Union, without resolution of this Charge, and the Board issued a complaint (ULP-4443) against the Town on May 6, 1991, incorporating the Union's charge.
1992 ORDER AND APPEAL
A formal hearing was held on April 6, 1992, and the Board issued its decision and order on September 9, 1992 (1992 Order) in which it found that the Town had committed an unfair labor practice in violation of G.L. § 28-7-12 by unilaterally announcing at the negotiating session of November [sic] 19, 1990, that it was considering privatizing the fire alarm operation and by seeking bids for those services, which constituted a prohibited interference with the Town's fire alarm operators in the free exercise of their collective bargaining rights. (1992 Order, p. 9-10). The Board also found that the Town violated G.L. § 28-7-13 (6) and (10) "by its refusal to continue collective bargaining negotiations which had commenced in the fall of 1990." (1992 Order, p. 10). On September 9, 1992, the Board ordered the Town to "cease and desist from any and all activity designed to subcontract the performance of the duties of fire alarm operators without first negotiating therefore with Local 2198," and further ordered the Town "to resume negotiations with Local 2198 concerning the terms and conditions of fire alarm operators employed by the [Town] within thirty (30) days of the date hereof, with all terms and conditions of employment to be retroactive to July 1, 1990." (1992 Order, p. 11).
The Town filed an appeal on September 23, 1992, jurisdiction based on G.L. 1956 (1993 Reenactment) § 42-35-15 and (1995 Reenactment) § 28-7-29, and moved for a stay of the 1992 Order, which was heard by Famiglietti, J. in Chambers on March 23, 1993. The order issued by Judge Famiglietti on that date directed the attorneys to "seek a clarification of Paragraph 3 of the LRB order from the Board." On April 14, 1993, the attorneys filed a stipulation, stating that "the parties hereto agreed that paragraph 3 of the [1992 Order] is to be interpreted as if it read:
 "3. The [Town] is directed to resume negotiations with local 2198 concerning the terms and conditions of Fire Alarm Operators employed by the Respondent within thirty (30) days of the date hereto, for the period July 1, 1990, to and including June 30, 1991."
SPRING 1993 NEGOTIATIONS
On October 14, 1992, the Union sent the Town a letter, stating that because the Town refused to resume negotiations between Local 2198 and the Town, the Union was invoking the Fire Fighters' Arbitration Act. (Tr. 2 at 31, Union Exh. 3). Although arbitrators were appointed, no arbitration session took place. (Tr. 2 at 32 and Union Exhs. 4-7). However, sometime between April and June 1993, the Town and the Union held three (3) negotiating sessions, (Tr. 2 at 22, 35.), apparently at the urging of the neutral arbitrator. (Tr. 2 at 6, statement of the Union attorney). The issue of privatization was again discussed during at least one of these sessions. (Tr. 2 at 12-13, 28). On June 8, 1993, the Town held its annual financial town meeting, and approved a budget of $130,087 for the entire Fire Alarm Operation Services, and on June 15, 1993, the Town sent a letter to the president of the Union local advising him of this action and terminating the services of the dispatchers effective July 1, 1993, because the services were to be awarded to "another public agency." (Tr. 2 at 12, Union Exh. 2). On June 28, 1993, the Town Council passed a resolution to this effect. (Tr. 2 at 15, Town Exh. 1).
On July 20, 1993, Local 3346 of the Union filed an Unfair Labor practice charge with the Board on July 20, 1993. (1993 Charge).
1996 ORDER AND APPEAL
An informal conference on August 16, 1993, between the Union, the Town and the Board failed to resolve the Charge, and the Board issued a complaint (ULP-4719) (hereinafter referred to as the 1993 Complaint) against the Town on October 28, 1993, alleging several violations of G.L. §§ 28-7-12 and 28-7-13. A formal hearing was held on January 10, 1994, and briefs were subsequently filed by both sides. On January 5, 1996, the Board issued a decision finding that the Town had violated its 1992 Order by refusing to resume negotiations with the Union. (1996 Order, p. 9-10). The Board also found that the Town violated G.L. §§ 28-7-12 and 28-7-13 (3), (5), (6), and (10) by its actions. (1996 Order, p. 11-12). The Board ordered the Town to immediately reinstate the four (4) alarm operators with full back pay and benefits retroactive to July 1, 1993, less various offsets. (1996 Order, p. 12).
The Town filed an appeal on February 6, 1996, and filed a motion for stay pending appeal of the 1996 Order on March 8, 1996, which was granted March 12, 1996.
STANDARD OF REVIEW
The review of a contested agency decision by the Superior Court is subject to Rhode Island General Laws, Section 15, Chapter 35, Title 42 of the Reenactment of 1993. Section 15 entitles a person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final order in a contested case to seek judicial review. R.I.G.L. 1956 (1993 Reenactment) § 42-35-15 (a). Subpart (g) of § 42-35-15
states the standard to be applied by the Court in its review:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 "(1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the Agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact.Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. Rhode Island Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the Agency's decision. Newport Shipyard v. Rhode IslandCommission for Human Rights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Id. at 897 (quoting Caswell v.George Sherman Sand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Department ofEmployment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council,434 A.2d 266, 272 (R.I. 1981). However, Agency determinations as to questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. Rhode Island Conflict ofInterest Commission, 509 A.2d at 458. On review of the Superior Court's judgment, the Supreme Court determines whether legally competent evidence exists to support the decision of the Superior Court. Rhode Island Public Telecommunications Authority v. RhodeIsland Labor Relations Board, 650 A.2d 479, 485 (R.I. 1994).
DISCUSSION
As a threshold matter, the Court must determine whether the Rhode Island State Labor Relations Board had jurisdiction over the matter. In this case, the recent decision by our Supreme Court in Lime Rock Fire District v. Rhode Island State LaborRelations Board, 673 A.2d 51 (R.I. 1996) controls whether the State Labor Relations Board had jurisdiction to hear the Union's complaints. In Lime Rock, the Union representing the fire fighters employed by the Lime Rock Fire Department was negotiating a new contract with that district. While the negotiations were pending, the district held its annual financial meeting at which the voters eliminated the six (6) full-time fire fighter positions, then filled by union members, and increased the budget for part-time fire fighters, who were non-union. The decision took effect the following week, and the union fire fighters were laid off, at which point the union filed a complaint with the State Labor Relations Board. Id. at 52.
Specifically, the union charged that the district had
 "during Contract Negotiations, used the Union's Contract Proposals at a District Financial Meeting . . . to create an anti-union position and prompted the public in attendance to remove the union employees from the Fire Department" and also violated the labor laws by laying off the full-time fire fighters without consultation or discussion with the officers of the union . . . [and] the positions were "filled with non-bargaining unit employees." Id.
The Supreme Court held that the clear and unambiguous language of the Fire Fighters Arbitration Act, G.L. 1956 (1955 Reenactment) § 28-9.1-7 provides that arbitration is the exclusive remedy for unresolved issues between a union and the corporate authorities during negotiations.
 In the event that the bargaining agent and the corporate authorities are unable, within thirty (30) days from and including the date of their first meeting, to reach an agreement on a contract, any and all unresolved issues shall be submitted to arbitration. Id. at 53, quoting G.L. § 28-9.1-7.
General Laws § 28-9.1-3 (c) defines "unresolved issues" as
 "any and all contractual provisions which have not been agreed upon by the bargaining agent and the corporate authorities within the thirty (30) day period referred to in § 28-9.1-7. Any contractual provisions not presented by either the bargaining agent or the corporate authority within the thirty (30) day period shall not be submitted to arbitration as an unresolved issue. Id. at 54.
The court found that the union and the Lime Rock Fire District were in the midst of negotiating a new contract, and that after the financial meeting on April 20, 1992, "the status of the fire fighters' jobs was clearly an unresolved issue, " which could have been submitted to arbitration. Id. Because the union "failed to exhaust its remedy under the FFAA, [and] because the union failed to comply with the provisions of § 28-9.1-3 (3) and § 28-9.1-7 . . . within the designated period, it has waived its right to pursue that remedy." Id.
THE 1991 COMPLAINT
In this case, it is assumed that in 1990 the Union and the Town were in contract negotiations pursuant to G.L. §28-9.1-13, which provides that:
 "[i]t is the obligation of the bargaining agent to serve written notice of request for collective bargaining on the corporate authorities at least one hundred twenty (120) days before the last day on which money can be appropriated by the city or town to cover the contract period which 18 the subject of the collective bargaining procedure.
Even though neither the transcript of April 6, 1992, nor the January 10, 1994, hearings contain documentation that such written notice was sent within the appropriate time period, Union Exhibit 3 dated October 5, 1990, which is part of the 1992 Hearing Record, purports to be the original "Ground Rules for Contract Negotiations" containing eighteen provisions for conducting the negotiations, the dates for the negotiating period, the names of the Union and Town negotiating teams, and is signed by the Town and the Union, supporting the conclusion that the Town and the Union were negotiating the terms of a new contract to cover the period July 1, 1990, through June 30, 1991, within the meaning of § 28-9.1-13. According to these Ground Rules, the last date for submitting proposals was October 19, 1990, which was also the date set for the first negotiating session. A document entitled DRAFT purports to be a copy of the agreement submitted by the Town on October 19, 1990, and within that document is Article V, Management Rights: "To establish contracts or subcontracts for Town operations when it is determined to be in the best interest of the Town." (Tr. 1 at 37, Union Exh. 4). This provision was apparently rejected, as evidenced by a "X" next to it. (Tr. 1 at 37, statement by Union attorney). There is no dispute in the record that this provision addressed the right of the town to (sub)contract, or "privatize" the fire dispatch operation. Thus, the issue of privatization, which is the basis for both of the Union's complaints to the board, was an unresolved issue during the 1990 negotiations within the meaning of G.L. § 28-9.1-7 and the holding of LimeRock, 673 A.2d at 53-54. It is also undisputed that the Town advertised for bids to operate the fire dispatch service in the Kent County Daily Times on December 24, 1990, but did not accept the one bid it received. According to the Ground Rules, the negotiating period expired on November 19, 1990, and there is no evidence in the record showing that this period was extended. It is also undisputed that at the time of the April 6, 1992, hearing the fire dispatch service was still under Town control, and the operators were still employed by the Town, with no discharges or layoffs. (Tr. 1 at 25, 27). These facts differ from those in LimeRock only in that the Lime Rock Fire District voted to eliminate the fire fighter positions while negotiations were still open, whereas in the case at bar, the Town advertised for bids to privatize the dispatch service after the negotiating period ended. However, this difference is not significant, and it is reasonable to conclude that the issue of privatization was an unresolved issue that arose during valid negotiations between the Union and the Town within the meaning of § 28-9.1-3 (3), and therefore, the Union's exclusive remedy was to seek arbitration under G.L. § 28-9.1-7 within thirty (30) days of the end of their negotiating period, or by December 19, 1990, as construed by the Rhode Island Supreme Court in Lime Rock. Id. at 54. Accordingly, as to the complaint filed with the Rhode Island State Labor Relations Board on January 7, 1991, the Board was without jurisdiction to hear and adjudicate this dispute. (General Laws § 42-35-15 (1), (2), (3), (4)). The Court does not reach the issue of whether the Board's findings are supported by any evidence in the record.[1]
The Board's decision and order dated September 9, 1992, hereby is reversed .
THE 1993 COMPLAINT
Subsequent to the Board's 1992 Order, and while the Town's appeal to this Court was pending, the Union accused the Town of refusing to reopen negotiations and invoked arbitration. The Town apparently agreed, and arbitrators were appointed, but no hearings were held. However, in or around June 1993 the Town and the Union held three (3) negotiating sessions, during which the subject of privatization of the fire dispatch services was again discussed. On June 8, 1993, the Town held its annual financial town meeting, at which the taxpayers approved a budget for the fire dispatch services, and on June 28, 1993, the Town Council adopted a resolution subcontracting these services to a private agency, terminating the Union employees effective July 1, 1993.
Again, the threshold question is whether the Board had jurisdiction to hear the Union's 1992 complaint. In this instance, the facts are squarely on point with Lime Rock, which raised the issue of whether "a town financial meeting has the authority to abolish the positions of all employees in a particular class after having bargained collectively with them in the past and with whom negotiations for a new contract have commenced." Id. at 51. Just as in Lime Rock, the Union could have invoked (or re-invoked) its right to arbitration under §28-9.1-7 within the period designated by § 28-9.1-3 (3), that is thirty (30) days after the last negotiation session, or about mid-July, 1993. For whatever reason the Union did not do so, and instead submitted a complaint to the State Labor Relations board, which was without jurisdiction to hear it.[2]
The Board's order and decision dated September 9, 1996, hereby is reversed.
[1] Although the Board found that statements by one of the Town negotiating team members constituted an unfair labor practice, this issue is not addressed since it was not part of the Union's 1991 Charge nor the Board's 1991 complaint against the Town.
[2] The Union also charged that Chief Mruk, who was present at one of the June 1993 negotiating sessions, "tried to coerce members [of the Union] to work for him as a private entity," and "used contract proposals to determine his bid price on subcontracting." This Court's reading of the 1996 decision and order of the State Labor Relations Board is that it turns not on Mruk's remarks or conduct, but rather on the Town's decision to privatize, which as indicated above, should have been the subject of arbitration.